Pages 1 – 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
    vs.                             )  NO. CR 09-00417-EMC-2
                                    )
MOUNIR FAYEZ KARA,                  )
                                    )  San Francisco, California
              Defendant.            )  Wednesday
                                    )  December 10, 2014
_____)  10:43 a.m.

                    TRANSCRIPT OF TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:          MELINDA L. HAAG
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   ADAM A. REEVES
                        ROBERT S. LEACH
                        Assistant United States Attorneys


For Defendant:          RAMSEY & EHRLICH, LLP
                        803 Hearst Avenue
                        Berkeley, California  94701
                  BY:   ISMAEL J. RAMSEY, ESQ.


Also Present:           CHRISTINA CARRUBBA, U.S. Probation



Reported by  BELLE BALL, CSR 8785,  CRR, RDR
             Official Reporter, U.S. District Court

1    **WEDNESDAY, DECEMBER 10, 2014                    10:43 A.M.**

2                              **PROCEEDINGS**

3            **THE CLERK:**  Calling Case C-09-0417, U.S.A. versus

4    Mounir Kara.

5        Counsel, please come to the podium and state your name for

6    the Record.

7            **MR. REEVES:**  Adam Reeves and Robert Leach for the

8    United States.

9            **THE COURT:**  All right.

10           **MR. REEVES:**  Again, good morning, Your Honor.

11           **THE COURT:**  Good morning.

12           **MR. LEACH:**  Good morning, Your Honor.

13           **MR. RAMSEY:**  Good morning, Your Honor.  Ismail Ramsey

14   on behalf of Mounir Kara, also known as Michael Kara, who is

15   present and out of custody.

16           **THE COURT:**  Good morning.  And good morning,

17   Mr. Kara.

18           **THE DEFENDANT:**  Good morning, sir.

19           **THE COURT:**  Okay.  We are on for sentencing in this

20   matter.

21       Let me briefly review the procedural history.  On

22   April 29, 2009 a 38-count indictment was filed in this Court

23   charging a number of individuals, but including Mr. Kara, with

24   violations of 18 U.S.C. Section 371, conspiracy; 15 U.S.C.

25   Section 78j(b) and 78ff; and portions of the C.F.R., including

1  10b-5; and Section -- Title 18, Section 2, securities fraud,

2  Counts 2 through 35.  And violation of 18 U.S.C. Section 1505,

3  obstruction, which is Counts 37 and 38.

4      There is a forfeiture allegation.  And the Defendant was

5  named in Counts 1 through 38.

6      On July 13, 2011 the Defendant pled guilty to Counts 1 and

7  26 of the indictment.  And, judgment and sentencing after

8  completion of the other trials in this case were then set for

9  today's date.

10      And I do have the plea agreement; the presentence report

11  prepared by Probation; defendant's unredacted filing,

12  including Exhibits A through H.  I have now copies, also of

13  Dr. Shields', I think, latest psychological assessment and the

14  United States' sentencing memorandum.

15          **MR. REEVES:**  (Nods head)

16          **THE COURT:**  So, let me ask if there is anything else

17  that I might have missed.

18          **MR. RAMSEY:**  I would just add, Your Honor, that we

19  also included Dr. Shields' initial psychological assessment

20  that was done on behalf of the Court, that was ordered by

21  Judge Patel before he entered the pleas, the competency to

22  enter a plea.

23          **THE COURT:**  Right.  Is that separate from the tabs?

24          **MR. RAMSEY:**  I'm sorry; no, it's not, Your Honor.

25          **THE COURT:**  All right.  Any corrections that have to

1    be made still to the PSR at this point?

2              **MR. RAMSEY:**  No, Your Honor.  All of our corrections

3    have been resolved.

4              **THE COURT:**  Okay.  So, I'm familiar with the history

5    of this case, and the materials here.  And I had a couple of

6    questions.  And, you know, I would love to -- want to hear

7    your comments.

8         There's a lot, and everybody agrees with respect to the

9    depth and the severity of the medical issues that Mr. Kara has

10   been faced with, including emotional issues and psychological

11   conditions.  And I think those are well documented.  I don't

12   think there is any doubt about that.  And I think everybody

13   seems to be on board that consideration should be given to a

14   5H1.3 and a 5K2.0(a)(4) (sic) departure.

15        But the one thing that gives me some -- that sort of

16   moderates that mitigating factor is although Dr. Shields says

17   that he believes the conduct in the commission of the offense

18   was related to some of these medical conditions, I frankly

19   have a hard time seeing that, given the length of time that

20   this took place, over a three-year period; the number of

21   transactions; the number of individuals; the -- the

22   carefully-planned intricate nature of hiding the transactions,

23   the sophisticated nature of it.

24        You know, this is not somebody who committed a crime on an

25   instant's notice based on some foggy state of mind or some

```
 1   personality issue that would cause him to go into a rage or
 2   something.  This was one of the most prolonged, meticulous,
 3   intricate law violations that I've seen.
 4        So, Mr. Ramsey, maybe you can help me out.  I mean, what
 5   is the evidence -- other than Dr. Shields' conclusion, what is
 6   the specific evidence that the conditions that were diagnosed
 7   were causally related and somehow factored into the commission
 8   of the three-year offense here?
 9            MR. RAMSEY:  I think there are several factual -- or
10   several facts that have been documented and that are evidence
11   of his state of mind and his reduced cognitive ability at that
12   time.  There are documented evidence about his delusions that
13   were going on at the time.
14        There was police reports that were filed at the time of
15   the events, regarding reports that Mr. Kara had made, the
16   conclusions of the Vallejo police after they came and spoke
17   with him --
18            THE COURT:  Well, I'm familiar with that and the
19   digging, and his hands were bloody, and the fence, and the
20   suspicion and the neighbors and all that.
21        What I don't see is:  How does that relate to him
22   acquiring the information, deceiving his brother and then
23   giving that information to others?  I don't see the
24   connection.  I mean, it's almost at odds to be able to conduct
25   such an intricate plan while suffering from these delusions.
```

1      And I guess it is possible, people with paranoia and

2  schizophrenia can cabin their activity.  There are many people

3  who work as he has maintained his company during this period.

4  People can function and still suffer from these diseases.

5      But, I'm trying to see what the causal relationship is.

6  I'm not saying you necessarily have to show a causal

7  connection under 5H1.3, but it certainly would make it a more

8  compelling --

9      **MR. RAMSEY:**  No, I think that's right but I think the

10 capacity to reason and -- and his diminished capacity in

11 executive functions that Dr. Shields talked about, and that is

12 evidenced by some of these examples of things that were going

13 on and his views about his neighbor and so forth, that

14 reduction in executive functions and his ability to, you know,

15 to exercise particular judgment, that combined with the

16 effects of the narcotics I believe is what Dr. Shields is

17 saying is evidence of his diminished -- his capacity which

18 leads to -- to this -- this conduct.

19      Also, there is also the personality disorder that we did

20 not focus on as much, but that Dr. Shields also referenced

21 about the personality disorder of the pleasing personality

22 that -- that he has displayed.  Those three things --

23      **THE COURT:**  Let me ask you about that.  Let me ask

24 you about that.  Who was -- how does that work?  Who was

25 Mr. Kara trying to please in committing these crimes?  He

1  wasn't trying to please his brother, because he wouldn't tell

2  his brother about them.

3       **MR. RAMSEY:**  Well, he has a reclusive personality,

4  which Dr. Shields has talked about.  His friends are extremely

5  limited.  Emile Jilwan was really the only sort of long-time

6  closest friend that he had.

7       I mean, given his condition, it's difficult for him to

8  establish friendships.  And so the people that he was actually

9  providing information to sort of falls squarely within this

10  personality disorder.  So, the first is Emile Jilwan.  There

11  was a doctor who had helped save his life, essentially, with

12  the complications that he had from the stomach surgery.

13       And in addition to that, there was the mending of the two

14  families between Maher and Susie.  And essentially this --

15  some of the tips that went to Bassam Salman -- he obviously

16  didn't know about the tips to Karim Bayyouk at the time, but

17  the tips that went to Bassam Salman were specifically to

18  please him during the process of when the Kara family was

19  being introduced to the Salman family.

20       Just as a reminder to the Court, Bassam Salman's sister at

21  the time was engaged to be married to Maher.  And it was

22  during this meeting of the two families to try to introduce

23  them to one another and essentially to gain sort of acceptance

24  and closeness that the decision was made to give these tips to

25  Bassam Salman.

1    So, that's sort of squarely within this personality

2  disorder that Dr. Shields has spoken about.

3    **THE COURT:**  And you think the personality disorder,

4  is that something that qualifies for consideration under

5  5H1.3?  Is that a --

6    **MR. RAMSEY:**  I think it does, in combination.  I

7  mean, it's hard to take each of these, Your Honor, as

8  individually.  I think that it's the totality of the -- of the

9  circumstances of those that -- that do.

10    And, so, I do think it qualifies under 5H1.3.  And I do

11  think that there, you know, is a diminished capacity that is

12  due to -- that is due to a mental disorder.  That's

13  appropriately recognized by the Court.  I think it does put it

14  outside the heartland.

15    **THE COURT:**  Let me see if you have some comments,

16  Mr. Reeves, about --

17    **MR. REEVES:**  Yes.  Thank you very much, Your Honor.

18    I think these are important questions.  But I also think

19  there is direct evidence that answers them.

20    The United States Attorney's office struggled for a long

21  time with the evidence of this case in formulating our

22  sentencing recommendation.  It is the product of a great deal

23  of thought and consideration.

24    I say that because one of the deep driving lurking facts

25  is, as in any fraud, if you follow the money, and you really

```
 1   look at who got paid out of the profits from the illegal

 2   trading scheme, you don't see in this case what you see in

 3   most other frauds or most other insider-trading cases.  There

 4   is an utter absence of money being paid by Michael back to

 5   Maher for the illegal tips that he's receiving.

 6       And I think that is highly corroborative of Maher's

 7   testimony about the emotional circumstances, the neediness of

 8   Michael and the concern that Maher had to give the tips to

 9   Michael for some other purpose.

10       I recall his testimony about how he offered to pay him

11   money rather than provide him inside information at the time

12   of the Biosite trade.  I think that is profoundly illuminating

13   about Michael's -- to some extent, not to a legally

14   significant extent in terms of his responsibility for this

15   offense, but to an extent that is necessary for the Court to

16   evaluate in the sentencing hearing -- Michael's irrational

17   need to obtain this inside information.  Okay.  And he doesn't

18   pay Maher back for it.  In that way, this case is different.

19       That, that phenomena of -- of getting this gift of inside

20   information, secret information, plays itself out in the way

21   Michael then distributes it to family members and other

22   friends, and doesn't seek profits back from the illegal

23   trading.

24           THE COURT:  Except on the trading on his own account

25   that he shared with Mr. Jilwan, right?
```

1       **MR. REEVES:**  Mr. Jilwan.  And I will address that in

2   a second.

3       I think the Court is 100 percent right to be focused on

4   the extent to which trading profits are hidden or concealed.

5   That was a profoundly important fact in the sentencing of

6   Mr. Salman.  And, frankly, in the guilt of Mr. Salman.  I

7   think it's much less compelling when you look at the facts as

8   they relate to Mister -- Mr. Kara.  And I will address that in

9   a second.

10      But if you follow the money, you look for a return of

11  profits; you don't see that.  You see instead, as the Court is

12  intimately aware, based on trials, you see the passing off of

13  this almost beneficent sharing to the new family member.  To

14  Bassam Salman.  It's a way of ingratiating himself.

15      And you don't -- I believe the trial testimony was that

16  there was an offer by Mr. Salman to repay the money, but I

17  don't think that was fully accepted or meaningfully accepted,

18  given the magnitude of the profits, by Michael Kara.  That's a

19  very interesting fact that I think directly corroborates some

20  different motive by Michael Kara, which is a motive to please

21  others.

22      It plays itself out in the way he does the same sort of

23  thing to Michael Azar, who testified in this case.  A good

24  friend of the family, traded on inside information, knew that

25  it was coming from Maher, is not paying Michael back for that.

1    Again, this is Michael sprinkling gifts and inside information

2    and sort of wherewithal and very valuable information to his

3    friends.

4        What is his motive?  His motive is not a financial one.

5    It is a -- I think it's corroborative of a desire to please.

6        Okay.  I'm getting additional --

7            **THE COURT:**  I see.

8            **MR. REEVES:**  But, let me finish my point.

9        It's true for Mr. Azar, it's true for Mr. Mardini who also

10   testified, again, received this information without a pay-back

11   in any sense to Michael.  Michael to a lesser extent provides

12   this information to other friend like Mr. Jilwan, with whom he

13   trades.  They conduct a joint-trading enterprise, that we

14   credit the -- the evidence in the case that suggests that the

15   real reason they did it in Mr. Jilwan's name was to prevent

16   Mr. Kara's wife from learning that he's trading too much.  And

17   things of that extent.

18       It was not difficult to figure out that Michael Kara was

19   actively involved using the Jilwan account, specially when we

20   are assisted by such extraordinary agents like Jeff Chisholm.

21   But, it's actually looking at the computer records to see who

22   is actually accessing the file, and conducting the trades.

23       By contrast, it was very difficult to figure out

24   Mr. Bayyouk's role in conducting the trading for Mr. Salman.

25   And to that extent, I think there is an important distinction

1    in the quality of the evidence about an intent to really

2    deceive and hide the trading.  And that distinction, I think,

3    is critical in looking at Salman and Mr. Kara separately.

4        There are additional people who also received some of

5    these tips for Michael, for whom there was not money coming

6    back to Michael Kara.  They include Safwan Hito, Mr. Kara's

7    uncle whose name I've now forgotten, and Dr. Habib.

8        So, there is absolutely the sense of showering friends and

9    family with information to help them.

10           **THE COURT:**  Okay.  What about the actual self-profit

11   part of it?  If you can address that.

12           **MR. REEVES:**  We don't deny it.  He -- he wants to

13   make money, and did make money from this.  Okay?  There's no

14   question about that.

15       But when -- what -- the balance that has to be struck, in

16   our judgment, is:  Is this really someone who is fully

17   empowered to make the right decision?  And, he's empowered to

18   make the right decision, to follow the law, and knows that

19   it's illegal.

20       But he's not -- in the sentencing dynamic, you have to

21   weigh in the -- his mental illness as a contributing factor,

22   it seems to me, in -- in cutting against that.

23       And then, what's the punishment for a person who is not

24   fully able, as we expect, you know, people without these kind

25   of mental-health concerns, not fully able to control

1  everything that he's doing.  And certainly, as to the scope of

2  what he's doing.  So, that was a very important component in

3  our evaluation.

4        (Off-the-Record discussion between Counsel)

5        **MR. REEVES:**  And I'm reminded by my colleague

6  Mr. Leach that while it is true that Mr. Maher Kara did not

7  profit in terms of money, he certainly does benefit by helping

8  his brother.  And that was crystal clear in the testimony, and

9  he was quite candid about that as his motivation.  He wanted

10  to help his brother.

11       So, I think those are key well-established facts that

12  corroborate the deeper, more difficult-to-appreciate sense to

13  which there is a nexus between the mental-health issues and

14  the facts and circumstances of this crime that raise important

15  sentencing considerations about what's the right thing to do

16  for this Defendant on these facts.

17       **THE COURT:**  Let me ask you, so I understand,

18  therefore, the mental and emotional conditions, policy

19  statement, the 5H1.3, departure is a warranted one in light of

20  this because you think there is a causal relationship, and it

21  is a severe one.

22       What is your response to the diminished-capacity 5K2.13

23  argument that defense has made?

24       **MR. REEVES:**  I -- I think -- I think the reality is

25  that -- can I have just a second?

1              THE COURT:  Yeah.

2         (Off-the-Record discussion between counsel)

3              MR. REEVES:  Thank you, Your Honor.

4              THE COURT:  Yeah.

5              MR. REEVES:  Look, I think the bottom line is that

6    it's clear that Mr. Kara knew the difference between right and

7    wrong.  He knew absolutely that this scheme was illegal.  He

8    understood it at the time.  And he took some steps -- not as

9    elaborate as Mr. Salman's, but he certainly took some steps to

10   conceal.  He certainly lied to the SEC when they called and

11   asked him about it.

12        This is not a person who has difficulty understanding the

13   illegality of his conduct.  And he should be punished for it,

14   and he is rightly convicted for it.

15        That being said, the medical evidence raises additional

16   facts that sort of, I think, need to be weighed pursuant to

17   3553(a).  That is our analysis.  That the facts and

18   circumstances of this Defendant, given that mental illness

19   history, need to be considered.  They need to be weighed.  And

20   that they -- were they not present, a -- a guideline sentence

21   as recommended by the guidelines would be more appropriate.

22        But where they are present, they raise legitimate

23   questions about incarceration as a form of punishment for this

24   Defendant with this disease.  That's where we come out.

25              THE COURT:  All right.  And I understand your

1    position with respect to the extraordinary cooperation that

2    was rendered by Mr. Kara under -- so the 5K1.1, if the other

3    departures don't get you there, certainly the 5K1.1 gets you

4    to a point where you would recommend no incarceration time.

5           **MR. REEVES:**  Well, not to overly complicate this, but

6    again, if we -- if there were none of the evidence about

7    mental illness, we would look at the cooperation.  The

8    cooperation deserves a 5K1.1 motion, and the government has

9    made that motion.  We consider it extraordinary.

10    It's not -- he didn't risk his life.  There are going to

11    be other defendants before the Court in other circumstances

12    that go even further.  But under the circumstances of this

13    case, and the complexity of this case, which then takes us a

14    little bit into the mental-health issues and how they affected

15    the scope of the scheme and the motivations of the scheme, and

16    in his willingness to candidly work through those issues with

17    the government, all of that is extraordinary.  And he deserves

18    full credit for that.

19    But our calculation, to be consistent with our policies,

20    is that the cooperation takes him down to -- I think it was

21    sentencing level 13?

22           **THE COURT:**  Yeah, 13 is what your --

23           **MR. REEVES:**  And, but then, I do consider it

24    incumbent on the government to at that point weigh separately

25    the 3553(a) sentencing considerations.

```
 1        And that's where, you know, again, the evidence of mental

 2   illness makes us question the appropriateness of a prison term

 3   for this Defendant on these facts.  And, it's by that analysis

 4   that we get to --

 5        THE COURT:  Let me ask you this.  If -- if there were

 6   a five-level departure based on the emotional and mental

 7   health, if I were to apply that which then brings it to a 20,

 8   from a 25 to a 20, and then a further 5K1.1, I'm not sure what

 9   the government's -- you recommend a 12-level departure down to

10   13, but I assume from a 25.

11        What happens if you start from a 20?  Does the government

12   have a policy regarding what level of reduction?

13        MR. REEVES:  I think he earned 12 levels, Your Honor,

14   based on his cooperation.

15        THE COURT:  So that would get you potentially to an

16   8.  If we took into account the 5H1.3 and the 5K2.0.

17        MR. REEVES:  So you start at 25.  Based on the

18   mental-health issues, you would reduce it to a 20?

19        THE COURT:  That's what Probation's recommending,

20   five-level decrease.

21        MR. REEVES:  We're recommending, based on his

22   cooperation, a 12-level reduction.

23        THE COURT:  Okay.  And if that were the case, we

24   wouldn't need a variance, because then it would be an

25   eight-level Zone A.  I think it is --
```

1          **MR. REEVES:**  You would be in Zone A.

2          **THE COURT:**  Yeah, Zone A.  Would that affect the

3    ability in terms of your recommendation of home detention, and

4    Probation's, for a 12-month period --

5          **MR. REEVES:**  I would want to double-check Zone A in

6    the guidelines, but I don't know why it would, Your Honor.

7          **THE COURT:**  Okay.  While he is checking that, do you

8    have a view on that, Mr. Ramsey?

9          **MR. RAMSEY:**  Yes, Your Honor.  I mean, I do agree

10   with the Court's analysis, that that would bring us down into

11   Zone A.  And quite frankly, before considering other 3553(a)

12   factors, so a variance would not be necessary.

13       I do think at that point, 12 months of home confinement

14   essentially would be an upward variance, which, that doesn't

15   seem like that would be appropriate in this case.

16         **MR. REEVES:**  Well, we think home confinement is

17   appropriate.  There should be punishment.  There should be

18   deterrence.  But the Court has to be mindful, as I know the

19   Court is mindful, about the special circumstances that are

20   associated with this Defendant.

21       So, punishment and deterrence are -- are important

22   components of the sentence.  Home confinement is a form of

23   punishment that's recognized in the guidelines.  And, we would

24   recommend that, Your Honor.

25         **THE COURT:**  Do you have an answer?  Would it be an

```
 1   upward variance if --

 2           MR. LEACH:  It would, Your Honor.  The guideline for

 3   level 8 is 0-6 months.  So 12 months in home confinement would

 4   be an upward variance.

 5           THE COURT:  Does Probation have any further thoughts

 6   about a recommendation of a five-level decrease based on the

 7   emotional and mental health -- you still think that is the

 8   appropriate --

 9           PROBATION OFFICER:  Yes, Your Honor.  Absolutely.

10           THE COURT:  Let me ask about restitution.

11           MR. RAMSEY:  Your Honor?

12           THE COURT:  Yeah.

13           MR. RAMSEY:  We had discussed this earlier, and there

14   are certain issues that have come up.  I don't know if -- we

15   were going to recommend jointly, and because there are certain

16   issues that have come up with Citadel, who is the victim who

17   is asking for restitution --

18           THE COURT:  Yeah.

19           MR. RAMSEY:  -- and they're attempting to recover

20   some funds from the forfeiture, not to belabor the Court with

21   details.  The Court will rely on Mr. Reeves and Mr. Leach to

22   relay --

23           THE COURT:  Okay.

24           MR. RAMSEY:  -- more information.  But we were going

25   to jointly request that issues of forfeiture and restitution,
```

1   if we could continue that part of the hearing to allow some

2   resolution of potential forfeiture issues, provided the

3   government maintains certain statutory rights, which I'll

4   allow Mr. Leach or Mr. Reeves to talk about.

5           **THE COURT:**  All right.

6           **MR. REEVES:**  Thank you, Your Honor.

7      In our memo, in our sentencing submission, the United

8   States recommended restitution in the amount of $738,539.42 to

9   the one identified victim of this insider-trading scheme.

10           **THE COURT:**  Right.

11           **MR. REEVES:**  Citadel, LLP.  And we are in agreement

12   with Probation about that amount.

13      And when you work through the amount of money that had

14   been seized at the filing of the indictment, and add to that

15   the restitution amount, the remainder to ensure that Mr. Kara

16   does not profit from his illegal proceeds that should be

17   forfeited here is $891,291.09.

18      After we made that recommendation in our sentencing memo,

19   counsel for Mr. Kara raised the possibility of using some of

20   the forfeited money, the $1.8 million that had been seized by

21   the government, to pay the restitution amount.  And there is a

22   process within DOJ that by which we can recommend that that

23   happened.  And, if approved, it may then be restored to the

24   U.S. Attorney's office so that we could pay the restitution,

25   make victims whole, and at least deal with that part of what

 1    needs to be done in this case.

 2        If -- that, A, takes some time.  B, it's new and we

 3    haven't had a chance to fully work through the details of

 4    that.  But, assuming all that can fall into place, which we

 5    are happy to pursue, that would require that the forfeiture

 6    amount be increased as to Mr. Kara by the amount that would

 7    otherwise have been paid out as restitution.  To ensure that

 8    all of his illegal profits as we understand them are accounted

 9    for, and that he's not in a position to have profited from

10    this crime.

11        And the resulting amount if all that were to happen would

12    be -- in forfeiture would be $1,629,830.50.

13        So there are enough steps that are associated with that,

14    that Mr. Ramsey and I had discussed the possibility of

15    conducting all of the sentencing hearing that relates to

16    everything other than forfeiture and restitution today.  And

17    then, working through some of these issues and finalizing the

18    judgment at a later date.

19            THE COURT:  Okay.

20        MR. RAMSEY:  And obviously there's -- you know, I

21    understand the government's position.  I just was trying to

22    deal with this from a procedure standpoint rather than a

23    substantive standpoint.

24            THE COURT:  Right.

25        MR. RAMSEY:  And I have this morning spoke with Robb

1    Adkins from Winston and Strawn who represents Citadel.  And he

2    indicated that their desire was to have the restitution

3    hearing, if possible, postponed so that they could still work

4    through the forfeiture issue.

5        So, I know the government had expressed concern that they

6    didn't want to waive or forego any opportunities to argue for

7    additional forfeiture on top of whatever's been seized.  We

8    have no objection to that.

9        There's a specific section that the government references

10   within the statute, but we think at this point, just

11   procedurally, it would make sense to put this off.  And then

12   we can make later substantive arguments which have been

13   initially raised in our briefs about forfeiture restitution.

14       **THE COURT:**  So, procedurally, I can proceed on the

15   sentencing portion and continue the forfeiture and restitution

16   until --

17       **MR. RAMSEY:**  Yes, Your Honor.  And I know the

18   government would like to explicitly put on the Record that we

19   did not, you know, object, or we will not object, and that

20   there is no waiver for these rights under --

21       **MR. LEACH:**  Rule 32, Your Honor, requires that you

22   orally announce the forfeiture and put the Defendant on notice

23   that there is going to be some element of forfeiture.

24       And so long as everybody's clear, and it sounds from

25   Mr. Ramsey like we are, the forfeiture proceeding later, we

1    don't see a procedural hurdle to doing it that way.

2          **MR. RAMSEY:**  Right.  We absolutely will waive that,

3    pending the additional forfeiture/restitution hearing.

4          **THE COURT:**  Do you have a date in mind as to when you

5    think we should reconvene on the forfeiture?

6          **MR. RAMSEY:**  Some of this depends on how long the

7    government think it will take to fully consider the

8    restoration hearing.

9          (Off-the-Record discussion between counsel)

10          **MR. REEVES:**  I think, approximately 30 days.

11          **THE COURT:**  So, why don't we pick a date now, Betty,

12    in January.

13          **THE CLERK:**  January 14 at 2:30.

14          **THE COURT:**  All right.  So, I will make clear that

15    there is going to be a further forfeiture proceeding, and a

16    likelihood of some forfeiture judgment in this matter,

17    pursuant to a hearing.

18          **MR. REEVES:**  Respectfully, I think that what is

19    important is that the Court make clear that it intends to

20    order forfeitures today, but we will wait until January 14 to

21    resolve the amount of that forfeiture order.

22          **THE COURT:**  All right.  Well, then, that's what I

23    will say.  That I'm intending to impose forfeiture, but it is

24    the amount in question that will require further briefing and

25    hearing, which will take place on January 14th of next year.

1        **MR. RAMSEY:**  That's fine, Your Honor.  As long as we

2   preserve our right to make substantive arguments about

3   forfeiture and restitution.

4        **THE COURT:**  Yes, yes.

5        **MR. REEVES:**  Thank you, Your Honor.

6        **THE COURT:**  All right.  Let me ask whether your

7   client would like to say anything at this point.

8        **MR. RAMSEY:**  Yes, Your Honor.  Obviously, he's

9   conveyed things in his written letter to the Court.

10       **THE COURT:**  Yes, which I have seen.  And I've seen --

11   I've read all the other supporting letters as well.

12       **MR. RAMSEY:**  So, given that, he does have a few brief

13   -- brief comments.

14       **THE COURT:**  All right.

15       **THE DEFENDANT:**  Your Honor, I just wanted to tell you

16   that I hope you accept my sincerest apologies for my conduct

17   on my charges, insider trading and conspiracy.  And there is

18   no excuse for my behavior.  I realize that I was wrong, and

19   that I have crossed the line.  And I admit that I was wrong,

20   and I accept full -- full responsibility for my behavior.

21       I promise the Court that I would never do that.  I love

22   this country.  It was the only country that has ever given me

23   shelter, given my family shelter as we left Lebanon.  I have

24   hurted this country.  I will never do that again.  Ever.

25       Give me another chance.  And, I will not disappoint you.

1   You will never hear my name in this court or any other court,

2   again.  As long as I live.  I'll give you my word of honor on

3   that.

4       Thank you for listening.

5           **THE COURT:**  All right.  Thank you, Mr. Kara.

6       Any reason why judgment should not be imposed?

7           **MR. RAMSEY:**  No, Your Honor.

8       (Off-the-Record discussion between counsel)

9           **THE COURT:**  I do think that in this case, the parties

10  have properly recommended that there be no custodial time.

11  And, I'll explain my analysis.

12      But, I do think that there need to be some element of

13  punishment.  And I think that can be satisfied not only with

14  the fact of conviction, but with some period of home

15  detention.

16      And where I will end up is a Level 8, and I'm going to

17  impose six months of home detention followed by three years of

18  supervised release.  I don't think it is necessary to do five

19  years.  I am convinced that there's not a deterrent need.

20      I'm convinced that Mr. Kara is sincere in seeking the

21  guidance, supervision, and therapy that he needs.  And that

22  three years is a long-enough time to test that and make sure

23  that things are on the right track.

24      But let me first go through the guideline calculations.  I

25  agree with the guideline calculations contained in the PSR,

1  that given the amount of the gain here and the nature of the

2  offense, that under 2B1.1(B)(1), there is a -- we start with a

3  level 26.  Because there has been an attempt to impede the

4  administration of justice in terms of the untruthfulness that

5  was conveyed to the SEC investigators and the other things

6  that are set forth in the PSR, that a two-level increase is

7  warranted under 3C1.1.

8      The adjusted offense level is 28, but with acceptance of

9  responsibility that brings it down to 25.  But as we have

10  discussed, given the extraordinary mental-health and emotional

11  conditions that have been well documented here, which does

12  appear to have some causal relationship to the offense

13  committed, notwithstanding what I said earlier in terms of its

14  prolonged nature, its intricate nature.

15      But I do think for the reasons that particularly

16  Mr. Reeves had pointed out, that a departure under 5H1.3 and

17  5K2.0(a)(4) (sic) is warranted, and as recommended by

18  Probation, I think a five-level adjustment is warranted there,

19  bringing the offense level to 20.

20      And, I think, I also agree with the government that

21  there's been extraordinary cooperation on the part of

22  Mr. Kara.  And as we will recall, this cooperation required

23  not only the usual kind of testimony, but testimony which was

24  difficult and which was given in trials against friends and

25  relatives.  And the fact he had to waive his rights to

1    confidentiality and open up his medical records, very

2    sensitive medical records, to the Court, and to the process in

3    order to allow that cooperation to proceed, I think makes this

4    an extraordinary case of cooperation.

5        And therefore, the government's suggestion of a 12-level

6    decrease under 5K1.1 is granted, bringing this to an offense

7    level 8.  And with the criminal history category of I, we are

8    in Zone A, which calls for zero to six months.

9        And I've already stated that considering the 3553(a)

10   factors, for all the reasons stated in the PSR and the papers,

11   including the background, the difficulties, the trauma that

12   Mr. Kara has experienced in his life, and the resulting

13   disorder, that he has -- with which he's been diagnosed, and

14   his physical health conditions which would not be well-suited

15   for any kind of incarceration, balance that against the need

16   for some punishment and the nature of his conduct here,

17   although being a matter of perhaps motivated by a desire to

18   please, was nonetheless one -- a course of conduct that was

19   thought out, that was planned, that took place over a

20   three-year period, and was not just a compulsive act, a single

21   act of compulsion but a very intricate plan and complicated

22   process involving several transactions, many transactions,

23   that a message of punishment and some deterrence needs to be

24   sent.

25       And that's why it is appropriate to impose the conditions

1   of home confinement which I think is the closest thing we can

2   come to incarceration without actually risking his health in

3   actual incarceration in a penitentiary or a jail.

4       So, taking into account the 3553(a) factors, that is the

5   -- where I come out.

6       Therefore, pursuant to the Sentencing Reform Act of 1984,

7   it is the judgment of this Court that Mounir Michael Kara is

8   hereby placed on probation for a term of three years.  The

9   term consists of three years on each of Counts 1 and 26, all

10  terms to run concurrently.

11      While on probation, the Defendant shall not commit another

12  federal, state or local crime, shall comply with the standard

13  conditions that have been adopted with this Court, shall

14  refrain from any unlawful use of a controlled substance and

15  submit to a drug test within 15 days of release of probation

16  and two periodic drug tests thereafter and shall comply with

17  the following conditions:

18      One, the Defendant shall participate in assessment for

19  drug and alcohol abuse as directed by the Probation Officer.

20  And participate in any recommended treatment until such time

21  as the Defendant is released from treatment by the Probation

22  Officer.  The Defendant is to pay all or part of the costs of

23  this treatment at an amount not to exceed the cost of

24  treatment, as deemed appropriate by the Probation Officer.

25  Payments shall never exceed the total cost of urinalysis and

1    counseling.  The actual co-payment schedule shall be

2    determined by the Probation Officer.

3        Two, the Defendant shall participate in a mental-health

4    treatment program as directed by the Probation Officer.  The

5    Defendant is to pay part or all of the costs of this treatment

6    in an amount not to exceed the cost of treatment as deemed

7    appropriate by the Probation Officer.  Payment shall never

8    exceed the total cost of mental health counseling.  The actual

9    co-payment schedule shall be determined by the Probation

10   Officer.

11       Three -- and I know that Defendant objects to this, but I

12   do think it is an appropriate condition -- that the Defendant

13   shall abstain from the use of all alcoholic beverages.  That

14   is something if, during the course of probation, Probation

15   believes that that is a condition that can be lifted, I

16   certainly would consider that.  But I think at the outset,

17   given the medical conditions and everything else, it is an

18   appropriate condition.

19       Four, the Defendant shall pay any restitution and special

20   assessment that is imposed by this judgment and remains unpaid

21   at the commencement of probation.

22       Five, Defendant shall not open any new lines of credit or

23   incur any new debt without the prior permission of the

24   Probation Officer.

25       Six, the Defendant shall provide the Probation Officer

1  with access to any financial information, including tax

2  returns, and shall authorize the Probation Officer to conduct

3  credit checks and obtain copies of income tax returns.

4      Seven, the Defendant shall participate in a location

5  monitoring program as directed by the Probation Officer for a

6  period of six months.  And, be monitored by location

7  monitoring technology at the discretion of the Probation

8  Officer.  Location monitoring shall be utilized to verify his

9  compliance with a curfew while on the program.  The Defendant

10  is restricted to his residence every day and times directed by

11  the Probation Officer.  The Defendant shall pay all or part of

12  the cost of the program based on his ability to pay, as

13  determined by the Probation Officer.

14      Eight the Defendant shall submit his person, residence,

15  office, vehicle, or any property under his control to search.

16  Such a search shall be conducted by a U.S. Probation Officer

17  at a reasonable time and in a reasonable manner, based on

18  reasonable suspicion of contraband or evidence of a violation

19  of a condition of release.  Failure to submit to such a search

20  may be grounds for revocation.  The Defendant shall warn any

21  residents that the premises may be subject to searches.

22      The ninth condition was also subject of Defendant's

23  objection.  And I agree that in this case, unless the

24  government convinces me otherwise, that I think the process of

25  mending fences and rebuilding family is an important part of

1   the rehabilitation process.  And the no-contact provision,

2   while I understand may have a prophylactic effect if there was

3   a risk of some recurrence, but I don't see that risk here.

4   And on the other hand, it will impair any chances of any kind

5   of reconciliation.  So I'm inclined to not impose Condition

6   No. 9.

7           **MR. REEVES:**  We agree, Your Honor.

8           **THE COURT:**  All right.  Thank you.

9       So, No. 9:  The next No. 9 then is:  Defendant shall

10  cooperate in the collection of DNA as directed by the

11  Probation Officer.

12      No. 10, the Defendant shall not possess or own any

13  firearms, ammunition or destructive devices or other dangerous

14  weapons.

15      It is further ordered that the Defendant shall pay to the

16  United States a special assessment of $200 which shall be due

17  immediately.  The Court finds the Defendant does not have the

18  ability to pay, and orders the fine waived.

19      It is the intention of this Court, as I stated earlier, to

20  impose a judgment of forfeiture, and possibly restitution, as

21  well.  But, as we have discussed, because of the complexities

22  and the possible ways that can be handled, I'm going to defer

23  the setting of any amounts and hearing further argument on the

24  merits of that until our hearing on January --

25          **THE CLERK:**  Fourteenth, at 2:30.

 1          **THE COURT:**  -- 14th, at 2:30.  Otherwise, the term of

 2   the sentence will be as I just announced.

 3      And in terms of the appeal right, I guess that -- is there

 4   a waiver of appeal?

 5          **MR. REEVES:**  Yes, Your Honor.

 6          **THE COURT:**  So there is no appeal on this.  So we

 7   will just continue this matter for the forfeiture and

 8   restitution matters to the 14th.

 9      If you have any additional briefings or cross-briefings

10   you want to give me on that, file it a week in advance.

11          **MR. RAMSEY:**  Yes, Your Honor.

12          **THE COURT:**  I already have your comments here, but if

13   you have any additional stuff, I'll give you a chance to

14   follow up on that.

15          **MR. RAMSEY:**  Your Honor, just one comment with

16   respect to the location monitoring.

17          **THE COURT:**  Yeah.

18          **MR. RAMSEY:**  I believe the government also agrees

19   with this, that I assume that the Probation -- we would

20   request that the Probation Office be directed to establish a

21   curfew that allows him to work.  We were thinking 7:00 a.m. to

22   7:00 p.m.

23          **PROBATION OFFICER:**  Your Honor, if I may speak to

24   that?

25          **THE COURT:**  Yeah.

```
 1            PROBATION OFFICER:  If we set a time, we would have
 2    to come to court every time to adjust it.  So if Mr. Kara had
 3    to work until 8:00 p.m. -- our goal is to allow him to work
 4    and make all his medical appointments.  We specifically
 5    selected this language to allow the flexibility for that.  We
 6    don't intend to make it more constrictive.
 7            MR. RAMSEY:  Okay.  That was our concern.  We just
 8    want to make sure --
 9            THE COURT:  All right.  Well, the language that I
10    have read is broad enough to allow that discretion.  And I
11    think that's the way to keep it, and I think everybody is on
12    the same page.
13        We want him to work.  And yet, you know, there has to be a
14    real curfew.
15            PROBATION OFFICER:  Correct.
16            THE COURT:  So, I think we are all on the same page
17    here.
18            MR. RAMSEY:  And the other issue with that is with
19    respect to travel on probation.  Both with respect to work,
20    which sometimes is outside of the district, in the Eastern
21    District, and then also he has family at other places.
22        I would ask that the Probation Office be given the
23    discretion to approve that travel, with sufficient notice,
24    without having to return to the Court every time.
25            PROBATION OFFICER:  The only time we would have to
```

```
 1   come to court is for international travel.

 2           THE COURT:  All right.  So domestic travel, I'm going

 3   to vest, again, Probation with the authority to approve travel

 4   outside of the district.  But anything outside this country

 5   would have to come back to this Court.

 6           MR. RAMSEY:  Thank you, Your Honor.

 7           THE COURT:  All right?  All right.  Thank you.  So,

 8   we will see you in January.

 9           MR. REEVES:  Thank you very much, Your Honor.

10           THE COURT:  Thank you.

11           MR. LEACH:  Thank you, Your Honor.

12           THE DEFENDANT:  Thank you, very much.

13           THE COURT:  Thank you.

14       (Conclusion of Proceedings)

15

16

17

18

19

20

21

22

23

24

25
```

**CERTIFICATE OF REPORTERS**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Wednesday, December 10, 2014

Belle Ball, CSR 8785, CRR, RDR